UNITED STATES of America,
Plaintiff-Appellee,

v.

Michael Joseph ORZECHOWSKI,
Defendant-Appellant.

No. 76–1315.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 21, 1976.

Decided Nov. 24, 1976.

As Amended on Denial of Rehearing
Jan. 24, 1977.

James R. Glover, Milwaukee, Wis., for defendant-appellant.

William J. Mulligan, U. S. Atty., Randall J. Sandfort, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before HASTINGS, Senior Circuit Judge, and PELL and WOOD, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

By an indictment returned on April 22, 1975, the defendant, Michael Joseph Orzechowski, was charged in two counts with violation of 21 U.S.C. § 841.[1] Count I charges that on March 24, 1975, the defendant unlawfully possessed with intent to distribute, and did distribute 13.602 grams of cocaine, a Schedule II Narcotic Drug Controlled Substance. Count II charges a similar offense involving 27.493 grams of cocaine occurred the following day. After a three day jury trial the defendant was found guilty. The defendant's Motions for Judgment of Acquittal and New Trial were denied, and on March 15, 1976, defendant was sentenced to 120 days imprisonment to run concurrently on each count, to be followed by a three year special parole term on each count. This appeal followed.

The transactional evidence is not in dispute. A special agent of the Drug Enforcement Administration received a telephone call on March 24, 1975, from the defendant offering to sell cocaine for $1,350 per ounce to the agent, not known by defendant to be an agent. During a subsequent phone conversation that day the agent offered to buy only a half ounce of cocaine as he explained he wanted to check its quality. Later that same day the agent and the defendant met in person to close the transaction. At this time the defendant represented the cocaine as being of "very high quality," which, he explained, was due to the fact that his partner was the smuggler. The defendant also represented that he could supply a large quantity of cocaine, four or five ounces, and that the more purchased the higher the quality would be, up to 85% in purity. The agent then paid the defendant $680 and received in return a clear plastic bag containing white powder. The following day the defendant again called the agent to see if he was satisfied with the cocaine delivered on the prior day and to inquire about a possible additional sale. The agent advised the defendant that the quality was satisfactory but it had not yet been decided how much cocaine would be purchased the next time. This led to another telephone call from the defendant a short time later in which the agent stated that he desired on this second occasion to buy a full ounce to better help determine what the quality of the cocaine would be if he later purchased as much as a pound. Shortly after that, by

---

1. In pertinent part § 841 provides:

  . . . it shall be unlawful for any person knowingly or intentionally—

  (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance . . . .

agreement, the agent and the defendant met to close this second transaction. The defendant represented the ounce of cocaine being sold to the agent as being of better quality than the cocaine of the day before. The price was again $1,350 per ounce. Defendant expressed a desire to deal in larger quantities, pounds and half pounds, as in this way, he explained, he could earn between $2,000 and $3,000 per week, which was preferable to working. The agent gave the defendant $1,350 and the defendant gave the agent in return the second clear plastic bag containing white powder.

The defendant raises five issues on appeal claiming: 1) the Government failed to identify the white powder in each transaction as being a controlled substance;[2] 2) the Government failed to provide defendant with certain Government documents claimed to be exculpatory; 3) the court failed to instruct on what were claimed to be two central issues of the case; 4) the charges in each count were duplications; and 5) the instructions given were also duplications.

## I.

## THE IDENTIFICATION OF THE SUBSTANCE

█ The defendant does not dispute that he sold two quantities of a substance he represented to be cocaine to the Government agent, but does dispute that the Government's evidence established beyond a reasonable doubt that those substances were in fact controlled substances as alleged in the indictment.

The manner of the listing of substances in the schedules is not uniform. Many are listed by chemical name. The listing here

in question controls substances related to, or derived or prepared from coca leaves, but the control is also extended to any such substances or preparations which are "chemically equivalent or identical with any of these substances."

The parties agree on the import of this listing. Those isomeric forms of cocaine which can be derived from coca leaves are controlled, but any isomers that cannot be so derived are controlled only if they are chemically equivalent or identical to the forms which are derived from the plant. Isomers are commonly referred to as chemical relatives. The parties further agree that one of the isomers of cocaine, l-cocaine, can be obtained from the plant, but that one of the other isomers of cocaine, d-cocaine, cannot be so derived. D-cocaine to be controlled, therefore, must be shown to be chemically identical or equivalent.

The Government claims that the white powder obtained from the defendant in both instances was l-cocaine, but if not, it was d-cocaine, which it claims is chemically identical or equivalent, and therefore also controlled. In effect the Government's position is that it makes no difference which isomer it was. The defendant claims that the Government failed to prove that the powder was l-cocaine, and that, therefore, if the powder may have been d-cocaine, it was not shown to be chemically equivalent or identical to those substances derived from the plant. The defendant's position is that the powder was not shown to be a controlled substance.

Both the Government and the defendant offered the testimony of experts, but there were critical disagreements in their testimony.

---

**2.** The term controlled substance is described in 21 U.S.C. § 802(6), as a "drug or other substance, or immediate precursor, included in Schedule I, II, III, IV, or V" of Part B of that subchapter. The indictment refers to a Schedule II substance. Section 812(b)(2) identifies a Schedule II drug as a drug or other substance which (a) has a high potential for abuse, (b) has a currently accepted medical use in the United States, or has a currently accepted medical use with severe restrictions, and (c)

abuse may lead to severe psychological dependence. Thereafter in § 812 set forth in Schedule II(a)(4) is the following listing as a controlled substance:

> Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of these substances
> · · · ·

The Government chemist testified that in his opinion, after the performance of seven various tests, the white powder in both transactions was l-cocaine. The tests used to arrive at this conclusion were a spot or strength test using cobalt thiocyanate; two microcrystalline tests, using plastinic chloride for one and gold chloride for the other; gas chromatography; mass spectromatry; infrared spectrophotometry; and mixed melting point. It was shown that these tests may help to identify the substance, but the only test administered which could distinguish l-cocaine from d-cocaine was the mixed melting point test.

This latter test, the mixed melting point test, is the one in question. The defendant claims that it was not properly performed since the results obtained were not in line with authoritative literature on the subject. Thus this test was unreliable to determine which isomer, l-cocaine or d-cocaine, may have been involved, the defendant argues. It is not necessary to technically explore the specifics of this or other tests except to note the area of disagreement. The Government chemist testified that he determined from this test that the substances tested, the known substance and the two quantities of the white powder, all melted separately and in combination of 242° centigrade and that that result justified his conclusion that the white powder was l-cocaine. The defendant, relying on a recognized treatise, claimed that the Government chemist's conclusion could only have been justified by a result showing a melting point of 215° centigrade, not 242°. Therefore, the defendant concludes, either the test was improperly administered so that it had no evidentiary value or the white powder was not l-cocaine. The Government chemist thought otherwise and explained that the manner in which the substances were prepared for the tests by him could have affected the melting point, but not his resulting conclusion. The government also pointed out that the defense expert recognized from his examination of literature on the subject that there could exist some variance in melting points. The record reveals that the defendant's expert had never actually run such a test himself to determine the melting point of l-cocaine. The defendant's defense did not include an independent test of any kind of the white powder involved.

The defendant next argues that since the mixed melting point test as run was not determinative, the Government should have run in addition a polarimetry test which, it is also agreed, could likewise distinguish between the d- and l- isomers of cocaine.

The next critical area of chemical testimony between the experts, which becomes important only if the l-cocaine identity conclusion of the Government witness is to be disregarded leaving the possibility that the white powder might be d-cocaine, is whether or not d-cocaine is chemically identical or equivalent to l-cocaine. The Government chemist testified that in his opinion d-cocaine was chemically equivalent or identical to the substance derived from the plant. The defense expert took a different view and explained that d- and l- isomers of cocaine react differently with other chemical reagents and in living organisms. The defendant characterizes the Government expert's opinion on this issue as only a guess and not entitled to any weight as an expert opinion.

The quality of the Government's case on the issue of identification of the white powder substances left something to be desired, but not so much as to require that the jury's verdict be set aside. The record reveals that the informed defense helped educate the Government on what its laboratory evidence should have been if all doubt was to be resolved about the identity of substances. No one expects, however, all experts to agree. It is apparent that the Government's laboratory work ran the risk of jeopardizing the success of the undercover agent's efforts.

In reviewing the sufficiency of this evidence we do not act as the trier of the facts to reconsider guilt or innocence. Our purpose is to determine if a rational trier of the fact could have found beyond a reasonable doubt that the defendant sold a controlled substance as charged. In resolving that

issue we must view the evidence and all reasonable inferences therefrom in the light most favorable to the Government, remembering, also, the jury's right to weigh the evidence, determine the credibility of witnesses, and draw justifiable inferences. *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Scher*, 476 F.2d 319 (7th Cir. 1973); *United States v. Cardi*, 478 F.2d 1362 (7th Cir. 1973), *cert. denied*, 414 U.S. 852, 94 S.Ct. 147, 38 L.Ed.2d 101 and 414 U.S. 1001, 94 S.Ct. 355, 38 L.Ed.2d 237; *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146.

The Government chemist sufficiently explained the conduct of the tests and accounted for the possible variation in the melting point. That being true, the mixed melting point test was adequate for identification purposes and the running of the polarimetry test, as advisable as it may have been, was not absolutely required. Also, if the mixed melting point test as run was adequate, there could remain no need to consider the other alternative, whether or not l-cocaine and d-cocaine are chemically equivalent or identical, but in the circumstances of this case that issue will also be examined.

Even though the Government expert's foundation for his opinion that l- and d-cocaine are chemically equivalent or identical was limited, he was found to be an expert by the court, and his training and experience justified permitting him to state and explain his opinion. That his opinion was disputed and contradicted by the defendant's expert who stated the contrary as a matter of scientific fact does not require that the Government expert's opinion be totally rejected by this court as a matter of law. The defendant cites *United States v. Cooper*, 277 F.2d 857 (5th Cir. 1960), for the proposition that an expert may give his opinion based on assumptions stated by him, but if those assumptions are not proved, testified to or otherwise taken to be true, the opinion is to be rejected as worthless. That was a civil condemnation case where the court held that one qualified as a hydraulic engineer was not thereby qualified to state his opinion on the issue of the probability of the use of certain real estate for a dam within the reasonably near future as might affect the issue of damages. That expert was recognized only as an expert as to the practicability of building a dam, not as an expert as to future real estate values. In the present case the subject matter was one within the general area of expertise of the Government expert who testified as to his opinion.

The determination of the qualifications of an expert is a matter ordinarily left to the discretion of the trial court. In this case the Government witness was a forensic chemist with a Bachelor of Science degree in chemistry employed by the Drug Enforcement Administration for the last seven years. He testified that he had analyzed substances over 3600 times. We can find no abuse of discretion by the district court in permitting the Government expert to testify and state his opinion. That opinion could be given such weight as the jury might see fit in accordance with the court's instructions.

The jury was fully instructed on the consideration, if any, to be given to the testimony of the experts on the identification issue.[3]

3. The court instructed that:

> The defendant cannot be convicted of these offenses unless the Government has proved beyond a reasonable doubt that the substances tested by the Government chemist are a form of cocaine, that is, either a derivative of coca leaves or a substance chemically equivalent or identical to such a derivative. There are only two ways that the Government could meet its burden of proof, that the substances tested by its chemist fall within the statute; the first is to prove beyond a reasonable doubt that the substances are a derivative of coca leaves. The second is to prove beyond a reasonable doubt that the substances are chemically equivalent or identical to a derivative of coca leaves. You may not speculate as to the identity of these substances. If you have reasonable doubt that the substances tested by the Government chemist are a form of cocaine covered by the statute you must find the defendant not

This whole subject matter was further well explained and argued to the jury by defense counsel. The jury was also fully instructed by the trial judge on the defendant's theory of the case.[4] There is no reason to believe that the jury did not understand the issues and follow the court's instructions conscientiously. *United States v. Harris*, 211 F.2d 656 (7th Cir. 1954), *cert. denied*, 348 U.S. 822, 75 S.Ct. 34, 99 L.Ed. 648.

What a substance is represented to be by one offering to sell it in such circumstances is ordinarily entitled to little or no weight. The defendant in this case at the time of the first sale represented the white powder to be good quality cocaine. He then came back to sell a second time after knowing that the buyer intended to check the powder he had sold him the first time. The defendant represented the powder to be high quality cocaine and expressed a strong desire and motivation for future larger sales based on that representation. The jury, therefore, had some basis under these circumstances for giving this defendant at least a little credit for knowing what he was talking about when he represented the powder to be good quality cocaine.

## II.

## FAILURE OF GOVERNMENT TO PROVIDE DEFENDANT WITH CERTAIN DOCUMENTS CLAIMED TO BE EXCULPATORY

Before and during trial the defendant sought and was denied access to certain Drug Enforcement Administration internal memoranda which related, among other things, to the tests necessary for determining whether a substance represented to be cocaine was an unlawful isomer of cocaine.

---

guilty. Similarly, if all the defendant (sic) has proven is that the substances are cocaine, without proving that they are either derivatives of coca leaves or substances chemically equivalent or identical to such derivatives, then the Government has not proven its case.

\* \* \* \* \* \*

The jury should consider all of the facts and circumstances and evidence to determine which of the witnesses are worthy of greater credence.

\* \* \* \* \* \*

The rules of evidence ordinarily do not permit witnesses to testify as to opinions or conclusions. An expert witness, however, is in a separate category. An expert witness is someone who by education and experience had become expert in some science, may state an opinion as to relevant and material matters in which they profess to be an expert, and may also state the reasons for the opinion. Expert witnesses have testified in this case. In determining what weight you should give to their opinions, you may consider their experience, educational background, theoretical understanding of the scientific discipline and the knowledge they have gained through reading authoritative scientific treatises and periodicals.

4. The court further instructed:

It is the defendant's theory of this case that l-cocaine is a derivative of coca leaves and that d-cocaine is neither a derivative of coca leaves nor a substance which is chemically identical or equivalent to a derivative of coca leaves. That d-cocaine and l-cocaine react differently with the chiral reagents and have different chiral reagents, and have different physiological effects, and that the only substance which is chemically identical or equivalent to the l-cocaine, which is a derivative of coca leaves, is synthetically produced, l-cocaine. It is further his theory that prior to performing the tests in this case, the Government chemist had no experience in performing a mixed melting point test on substances suspected of being l-cocaine, that he was not present when the supposed standard of l-cocaine was received in the laboratory, and never tested the proposed standard that the mixed melting point which he obtained was substantially higher than what he would have obtained had the substance which he tested been cocaine chloral platinate, and that if the substances which he tested by the mixed melting point were not pure, then the mixed melting point of the purer substance would have been even higher than the temperature which he measured. It is further his theory that the government chemist relied neither on standard reference spectra nor recognized scientific treatises in the field of analytic chemistry and that he did not compare his test results with that which appears in the scientific literature. If the evidence you have heard in support of the defendant's theory creates in your mind a reasonable doubt that the tests performed in this case are specific for a derivative of coca leaves or a substance which is chemically equivalent or identical to such a substance, then you must find the defendant not guilty.

The existence of these memoranda was verified during cross-examination and made available to the trial judge after the jury retired. Otherwise there were no discovery complaints as the Government followed an "open file" policy. Those papers, now a part of the record, included: (1) an internal general technical research report transmitted between two divisions of the Drug Enforcement Administration regarding research into an identification of optical isomers of cocaine; (2) a general internal Drug Enforcement Administration memorandum dealing with when, as a matter of general policy, the Drug Enforcement Administration should perform special polarimetry tests on cocaine evidence samples; and (3) a general internal Drug Enforcement Administration memorandum making lower Drug Enforcement Administration officials aware of potential optical isomers issues in the identification of cocaine evidence. This memorandum included several other general memoranda from various attorneys in the Drug Enforcement Administration and the Justice Department for the purpose of generally warning personnel within the Drug Enforcement Administration that the l-d isomer issue might arise in cocaine prosecutions. None of these allegedly exculpatory memoranda were concerned specifically with the appellant's prosecution; none were used by attorneys for the Government preparing for or trying the case; and none contained the statements of any witness who testified.

The defendant claims and the Government denies that the Documents were producible under Fed.R.Crim.P. 16. The Government relies on the exclusion provided in Rule 16(a)(2).[5] The defendant contends that the exclusion is not applicable since the papers were not "made by the attorney for the government or other governmental agents in connection with the investigation or prosecution of the case"; because the exclusion applies to pretrial, not trial, disclosures; and because the research report falls within (a)(1)(D) of the rule to which (a)(2) does not apply.[6]

■ The defendant correctly argues on the basis of *United States v. Nobles*, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), that Rule 16 is designed to govern pretrial disclosure, not to constrict a district court's control over evidentiary questions arising during trial. Since the defendant continuously sought disclosure of the memoranda throughout the trial, the (a)(2) exclusion is of no avail to the Government. We do not believe, however, that the district judge erred in denying defendant's motions until the end of all the testimony. Both Rule 16(a)(1)(C) relating to documents, and Rule 16(a)(1)(D) relating to reports of scientific tests, limit discovery in part to those items "which are material to the preparation of the defense . . . ." The test of materiality applied by the courts when dealing with the discovery of documents, books, etc., under old Rule 16(b) is equally applicable to this same requirement now contained in both Rule 16(a)(1)(C) and Rule 16(a)(1)(D). This test provides that the disclosure of evidence in question "must enable the accused to substantially alter the quantum of proof in his favor." *United States v. Marshall*, 532 F.2d

5. Rule 16(a)(2) reads:

(2) *Information Not Subject to Disclosure.* Except as provided in paragraphs (A), (B), and (D) of subdivision (a)(1), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by the attorney for the government or other government agents in connection with the investigation or prosecution of the case, or of statements made by government witnesses or prospective government witnesses except as provided in 18 U.S.C. § 3500.

6. Rule 16(a)(1)(D) reads:

(D) *Reports of Examinations and Tests.* Upon request of a defendant the government shall permit the defendant to inspect and copy or photograph any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government, and which are material to the preparation of the defense or are intended for use by the government as evidence in chief at the trial.

1279, 1285 (9th Cir. 1976). Considering the contents of the memoranda and report, the purpose for which the memoranda and report were sought, the full knowledge of the subject matter possessed by defendant, and the extensive cross-examination of the government chemist at trial, we cannot say that these items were material within the meaning of Rule 16, or that their exclusion, if error, was not harmless. *See United States of America v. Harris*, 542 F.2d 1283, 1291 (7th Cir. 1976).

■ Since these memoranda did not include the prior statement of any witness who testified, they were not producible under the Jencks Act, 18 U.S.C. § 3500.

■ A remaining consideration is the application of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), as the memoranda are claimed by the defendant to be material and exculpatory. We believe they are neither. The defendant is not entitled to a reversal unless in the light of all the evidence introduced at trial the unrevealed evidence is material. *United States v. Esposito*, 523 F.2d 242 (7th Cir. 1975), *cert. denied*, 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976). The most recent case dealing with this subject is *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). The omission to disclose, it is held, in a constitutional sense must be found to have deprived the defendant of a fair trial as evaluated in the context of the whole record before reversal is required. The test of materiality, the Court indicates, may vary according to the circumstances, but the case is not read as requiring, even in circumstances where the threshold test of materiality may be low, that as a matter of constitutional law everything must be disclosed which might influence a jury. Evaluating the omission here in the context of the entire record, we cannot find that the failure to supply these memoranda, not directly related to this case, was of such significance that the defendant was thereby deprived of a fair trial. The memoranda only evidenced a Government awareness and concern with the same cocaine isomer issue which the

defendant raised and thoroughly explored at trial. His defense on that issue was not dependent on the memoranda. Every non-disclosure is not material. If this was error it was harmless. After considering the memoranda submitted to him at the conclusion of the trial, the trial judge summed up his view in these terms:

In the context of this case it is apparent that no substantial deprivation was inflicted upon the defense by virtue of the failure to produce these documents during the course of or prior to the trial. The defendant's attorneys were well versed in the science of chemistry and were very much aware of the analyses disclosed by these materials. The defense devoted lengthy direct and cross-examination to these very principles and theories. In view of this circumstance the court cannot now hold that substantial prejudice has resulted from the conduct of the government's agents and attorneys.

### III.

### INSTRUCTIONS

■ The defendant concedes that to a large measure his tendered instructions were given. His first objection, however, is to the fact that the court permitted the jury, under the instructions, to consider the Government's alternate theory that d-cocaine and l-cocaine were chemically identical or equivalent, instead of limiting the issue to whether or not the Government had proven that the powder was l-cocaine. The basis of this objection is the claim that the Government's evidence was insufficient to permit the alternate theory to go to the jury. We find no merit to that position, and based on evidence we have already discussed, believe the question was a question of fact properly left for the jury.

■ Next, the defendant contends that he was entitled to an instruction defining the term "chemical equivalents." The jury was instructed that the Government's burden of proof required that the powder be shown to be either l-cocaine or alternatively

d-cocaine, provided d-cocaine was also shown to be "chemically equivalent or identical to l-cocaine." No instruction as to the meaning of the statutory phrase "chemically equivalent or identical" was given. The defendant urged the giving of an instruction to the effect that to be chemically equivalent or identical the substances must not only have the same chemical formula but the substances must also have the same chemical reaction with other chemicals. Both the Government and defense experts agree in principle with this explanation of the terms. The meaning of the phrase was, therefore, not in dispute between them, only the result of its application. Although the statute defines certain other of its own terms, it offers no definition of this phrase. None is needed. The terms have a common meaning and were used in the conventional sense. The similarities or differences of the two isomers were fully explored in the evidence and arguments before the jury. As in *United States v. Kramer*, 355 F.2d 891 (7th Cir. 1966), partially vacated and remanded on other grounds, 384 U.S. 100, 86 S.Ct. 1366, 16 L.Ed.2d 396 (1966), in some circumstances an elaboration on the meaning of statutory words may be preferred, but here, as there, it cannot be said that the instructions were so inadequate that the jury could not fairly determine the issue. If it was error not to instruct on the meaning of these terms it also was a harmless error.

## IV.

### DUPLICITY

Defendant claims that each of the two counts is duplicitous in that each charges possession with intent to distribute, together with the actual distribution of cocaine. Title 18 U.S.C. § 841(a)(1) makes it unlawful to "distribute" or to "possess with intent to distribute" a controlled substance. The question resulting is whether or not this is a case of alleging in one count the commission of multiple acts in violation of the same statutory provision, or a case of separate and distinct offenses being alleged in the same count.

"Duplicity" is the joining in a single count of two or more distinct and separate offenses. 1 Wright, *Federal Practice and Procedure*, § 142, at 306 (1969 ed.) One of the vices of duplicity is, as defendant argues, that the verdict does not reveal whether the jury found the defendant guilty on both or one or the other of the offenses charged.

The circuits are not in agreement. The Fourth and Sixth Circuits have taken the position that in cases where a single sale of a controlled substance gives rise to separate counts charging possession and sale there is in effect a merger of the two offenses permitting only one sentence upon conviction of both counts. *United States v. Atkinson*, 512 F.2d 1235 (4th Cir. 1975), *petition for cert. filed*, 45 U.S.L.W. 3011 (July 12, 1976); *United States v. Curry*, 512 F.2d 1299 (4th Cir. 1975), *cert. denied*, 423 U.S. 832, 96 S.Ct. 55, 46 L.Ed.2d 50 (1975); *United States v. Stevens*, 521 F.2d 334 (6th Cir. 1975). *See also United States v. Nichols*, 401 F.Supp. 1377 (E.D.Mich.1975). Therefore, following this reasoning, to join possession and distribution in one count may not be duplicitous.

The Fifth Circuit takes another view. Upon conviction on separate counts of possession with intent to distribute, and distribution of a controlled substance, each count stands separately for sentencing purposes. There is no merger. The "different evidence" test is applied. Convictions for separate offenses arising out of the same factual situation are held to be permissible if the statute proscribing the conduct requires proof of different facts and elements as to each of the separate offenses. *United States v. Horsley*, 519 F.2d 1264 (5th Cir. 1975), *cert. denied*, 424 U.S. 944, 96 S.Ct. 1413, 47 L.Ed.2d 350 (1976); *United States v. Costello*, 483 F.2d 1366 (5th Cir. 1973). It follows, therefore, that in that circuit to join possession with intent to distribute and distribution in one count would be duplicitous.

The Tenth Circuit has also considered the problem. It has held that it is not duplici-

tous to charge possession with intent to distribute together with distribution in one count since § 841(a)(1) sets forth several ways in which the statute may be violated, including both distribution and possession with intent to distribute. Therefore, it is proper to allege in the conjunctive without the indictment being duplicitous. *United States v. Herbert*, 502 F.2d 890 (10th Cir. 1974), *cert. denied*, 420 U.S. 931, 95 S.Ct. 1134, 43 L.Ed.2d 403; *Cordova v. United States*, 303 F.2d 454 (10th Cir. 1962). *Accord, United States v. Hobbs*, 392 F.Supp. 444 (D.Mass.1975); *United States v. DiLaura*, 394 F.Supp. 770 (D.Mass.1974).

The approach of the Tenth Circuit has been followed in other statutory situations. *United States v. Zeidman*, 540 F.2d 314 (7th Cir. 1976); *Troutman v. United States*, 100 F.2d 628 (10th Cir. 1938); *Joyce v. United States*, 147 U.S.App.D.C. 128, 454 F.2d 971 (1971), *cert. denied*, 405 U.S. 969, 92 S.Ct. 1188, 31 L.Ed.2d 242; *United States v. Astolas*, 487 F.2d 275 (2d Cir. 1973), *cert. denied*, 416 U.S. 955, 94 S.Ct. 1968, 40 L.Ed.2d 305.

Former § 4704(a) of Title 26 U.S.C., repealed in 1970, provided that it was unlawful to purchase, sell, dispense or distribute a narcotic drug not in or from the original package bearing tax stamps. The defendant in *Turner v. United States*, 396 U.S. 398, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970), was charged in one count with purchasing, dispensing and distributing heroin in violation of that section. Although duplicity was not directly raised as an issue, the Supreme Court stated that, "The general rule is that when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."

We see no reason why that general rule should not be applicable here. The offense charged in each count, possession with intent to distribute and distribution, alleged in the conjunctive, was statutory language drawn from the same sentence of subsection (a)(1). We hold that the counts are not duplicitous.

There being no duplicity found in the charges, none is found in the instructions. We affirm.