# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1330

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMES E. FALLON,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 01 CR 50046—**Philip G. Reinhard**, *Judge.*

———————

ARGUED SEPTEMBER 16, 2003—DECIDED OCTOBER 24, 2003

———————

Before FLAUM, *Chief Judge*, DIANE P. WOOD and WIL-LIAMS, *Circuit Judges.*

FLAUM, *Chief Judge.* In 2002, James Fallon was convicted of eleven counts of bank fraud in violation of 18 U.S.C. § 1344(1). He was sentenced to 32 months in prison and ordered to pay $316,139 in restitution. On appeal, Fallon argues that he was deprived of a fair trial and that the district court erred in denying his motion to exclude his prior convictions. For the reasons set forth herein, we affirm the decisions of the district court and, consequently, Fallon's conviction.

## I. BACKGROUND

James Fallon and co-defendant Michael Borgetti engaged in a bank fraud scheme that operated in a manner similar to a check kite. While working as an independent wholesaler with the Greater Rockford Auto Auction, Fallon met Borgetti who owned a number of small businesses in Rockford, Illinois including Morgan Auto. Morgan Auto sold inexpensive ($1800 and less) used cars. Around 1990, Fallon left the Greater Rockford Auto Auction and went to work as an independent wholesaler for Morgan Auto.

In May 1992, Fallon and Borgetti opened a used car dealership known as AutoSmart. AutoSmart sold used cars in the $6,000 to $12,000 range. Borgetti was the president of AutoSmart, Fallon was the secretary, and each man owned 50% of AutoSmart's stock.

Borgetti did his banking with Alpine Bank in Rockford. To control the inventory purchases by the independent car wholesalers that he financed, Borgetti entered into a drafting agreement with Alpine Bank. Under this agreement, Borgetti and other representatives of his business could issue Alpine Bank drafts. Unlike checks, which are drawn against funds maintained in a particular account, these drafts were drawn directly on Alpine Bank. When drafts were presented to Alpine Bank for payment, a bank employee would call Borgetti and ask if he intended to pay the draft. With Borgetti's approval, the bank would cash the draft and Borgetti would then be required to reimburse the bank. The drafts were used to purchase inventory for both Morgan Auto and AutoSmart. Though there was no formal agreement, the parties' intent was that the drafts would be used to purchase cars. The drafts included fields for "Make," "Year," and "Serial Number."

Around 1994, Fallon and Borgetti began using drafts to artificially inflate the balances of the AutoSmart and Morgan Auto checking accounts at Alpine Bank. The fraud

began when Borgetti discovered that the AutoSmart account was overdrawn. Fallon and Borgetti discussed the situation and decided to resolve it by kiting checks from Morgan Auto's account to AutoSmart's. As this situation continued on a regular basis, oftentimes there was not enough money in the Morgan Auto account to cover the checks payable to the bank. In those events, Borgetti issued drafts from AutoSmart to Morgan Auto and deposited those drafts into the Morgan Auto account. In early stages of the scheme, the kiting occurred for brief periods and was then corrected by increased cash flow. By early 1997, the fraud reached a point where it could not be stopped. After a while, Borgetti became concerned that the appearance of his signature on all of the fictitious drafts would cause Alpine Bank to discover the fraud, so Fallon began signing the drafts from AutoSmart to Morgan Auto.

Understandably, the numerous fraudulent drafts made it difficult for Jerri Anderson, AutoSmart's secretary/bookkeeper, to perform her responsibilities. Ordinarily, when Anderson received copies of the bank drafts she would match the drafts to purchased vehicles. Once Anderson discovered that cars listed on many of the drafts were "missing," she alerted Fallon to the problem. Fallon told her to record the drafts as loans from AutoSmart to Morgan Auto.

During August and September 1998, Fallon signed a total of 134 drafts on behalf of AutoSmart that were payable to Morgan Auto. Those drafts listed a total of 324 vehicles, but according to AutoSmart's police book (an official inventory Illinois requires car dealers to maintain) AutoSmart purchased no vehicles whatsoever from Morgan Auto during that time period.

In October 2001, a federal grand jury returned an indictment charging Fallon with twenty-six counts of bank fraud. Borgetti was also indicted, pled guilty, and agreed to cooperate in the case against Fallon. A jury convicted Fallon on eleven counts.

## II. DISCUSSION

### A. *Brady* violation

On direct examination at Fallon's trial, Borgetti testified about cash-flow problems that AutoSmart experienced during the time period of the fraud. On cross-examination, defense counsel challenged this testimony by confronting Borgetti with AutoSmart's monthly "Statements of Profit and Loss" for 1997 and 1998. The exhibit showed that as of August 1998 AutoSmart had a total profit of $156,000. Borgetti explained, however, that he and Fallon had inflated these numbers for the purpose of hiding AutoSmart's true financial condition. Borgetti then told the defense counsel that he had told the government that the statements were inflated. Since the government had not disclosed Borgetti's statements on the "inflated inventory" to the defendant, the defense believed Borgetti was lying and challenged his testimony in front of the jury.

The next day, after reviewing the FBI's notes as well as his own, the government's attorney confirmed that Borgetti had, in fact, informed the government of this information. Despite this admitted oversight, the district court denied defense counsel's motion to dismiss the indictment based upon an alleged *Brady* violation, finding that the defendant had not been prejudiced by the late disclosure. We review the district court's decision for abuse of discretion. *United States v. Wilson*, 237 F.3d 827, 831-32 (7th Cir. 2001) (citing *United States v. Asher*, 178 F.3d 486, 496 (7th Cir. 1999)).

Fallon argues that the government's failure to disclose this additional material regarding Borgetti prior to trial constituted a violation of the government's obligation to disclose impeaching evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L. Ed. 2d 104 (1972). Under *Brady* and its progeny, the government

has the affirmative duty to disclose evidence favorable to a defendant and material either to guilt or punishment. *United States v. Gonzalez*, 93 F.3d 311, 315 (7th Cir. 1996). Although the term "*Brady* violation" is often used to refer to any breach of the government's broad obligation to disclose any exculpatory information, the Supreme Court had made it clear that there is no true "*Brady* violation" unless the non-disclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. *Strickler v. Greene*, 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L. Ed. 2d 286 (1999). To prevail on his *Brady* claim, Fallon must show three components: (1) that the evidence at issue, Borgetti's admission concerning the Profit and Loss statements, was favorable to him because it is exculpatory or impeaching; (2) that the government willfully or inadvertently suppressed the evidence; and (3) that Fallon suffered prejudice as a result. *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002) (citing *Strickler*, 527 U.S. at 281-82).

While Borgetti's statements regarding the "inflated inventory" may have been favorable to Fallon, we cannot conclude that the delayed disclosure caused him prejudice. To establish prejudice under *Brady*, a defendant must establish a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Strickler*, 527 U.S. at 280. The value of the "inflated inventory" evidence was for the impeachment of Borgetti—it demonstrated a false statement and unlawful act. However, this evidence was merely cumulative of an extensive amount of other evidence that showed Borgetti to be a liar and a fraud (e.g., his admissions that he defrauded Alpine Bank for four years) and therefore was not material. *See United States v. Wilson*, 237 F.3d 827, 832-33 (7th Cir. 2001) (finding that undisclosed evidence that a cooperating witness had tested positive for marijuana use while in the witness protection program was not material because it

would have been cumulative of extensive evidence of the witness's drug use); *United States v. Dweck*, 913 F.2d 365, 370-72 (7th Cir. 1990) (concluding that government did not violate duty to disclose material about a witness under *Brady* where material was merely cumulative of witness's extensive involvement in the drug trade).

Fallon argues that his trial strategy was affected by the late disclosure of Borgetti's statements. Materiality focuses not on trial preparation, but instead on whether earlier disclosure would have created a reasonable doubt of guilt. *See United States v. Agurs*, 427 U.S. 97, 112, n.20, 96 S.Ct. 2392, 49 L. Ed. 2d 342 (1976) (rejecting argument that the materiality test should be defined in terms of the defendant's ability to prepare for trial rather than in terms of fact finders' assessments of guilt); *Matthew v. Johnson*, 201 F.3d 353, 360 (5th Cir. 2000) (finding that a definition of the materiality requirement in terms of defense strategies is at odds with the *Brady* rule's purpose of ensuring that the accused receives an impartial party's assessment of guilt based on all available evidence); *United States v. Rogers*, 960 F.2d 1501, 1511 (10th Cir. 1992) (materiality does not focus on trial strategy). Accordingly, despite Fallon's insistence that the delayed disclosure caused the defense's theory to shift midstream and undermined the defense counsel's credibility with the jury, the salient issue remains whether the late disclosure of Borgetti's statements undermines confidence in the outcome of the trial. *See United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L. Ed. 2d 481 (1985).

The government presented overwhelming evidence of Fallon's guilt, including evidence that he signed a total of 134 drafts for nonexistent vehicles during the last two months of the scheme and mislead Jerri Anderson as to the purpose of the fraudulent drafts. In light of the weight of countervailing evidence, we are unconvinced that there is

a reasonable probability that timely disclosure of the evidence would have changed the result of the proceeding.

In any event, we have serious reservations as to whether Fallon's claim satisfies the suppression prong of the *Brady* test. Evidence is "suppressed" for *Brady* purposes if (1) the prosecution failed to disclose the evidence before it was too late for the defendant to make use of the evidence; and (2) the evidence was not otherwise available through the exercise of reasonable diligence. *O'Hara*, 301 F.3d at 569; *United States v. Reyes*, 270 F.3d 1158, 1167 (7th Cir. 2001). Again, the value of the "inflated inventory" evidence in this case was for the impeachment of Borgetti—it demonstrated an additional false statement and unlawful act. Borgetti expressly admitted falsifying the documents on cross-examination, thus the delayed disclosure did not prevent the defense counsel from effectively using the information. Furthermore, the "inflated inventory" evidence was clearly otherwise available through the exercise of reasonable diligence. Although Fallon claims to have relied upon the inflated "Statement of Profit and Loss," other financial documents and tax returns disclosed to the defense showed that AutoSmart had indeed sustained a large loss in 1998.

Accordingly, we find that the district court did not abuse its discretion in denying Fallon a new trial.

## B. Ostrich Instruction

Fallon claims that the district court abused its discretion by including the "conscious avoidance" or "ostrich" language in the jury instruction that defined the word "knowingly." We review the district court's decision to give the "ostrich" instruction for abuse of discretion, viewing the evidence in the light most favorable to the government. *United States v. Craig*, 178 F.3d 891, 896 (7th Cir. 1999).

The "conscious avoidance" or "ostrich" instruction "explain[s]to the jury that the legal definition of 'knowledge' includes the deliberate avoidance of knowledge." *United States v. Carrillo*, 269 F.3d 761, 769 (7th Cir. 2001). The instruction is appropriate when: (1) the defendant claims a lack of guilty knowledge; and (2) the facts and evidence support an inference of deliberate ignorance. *Id.*

Fallon clearly claimed a lack of guilty knowledge, thus, the second factor becomes the critical determination. Fallon argues that the government presented no evidence that he took any action to avoid knowing the truth. However, an inference of willfulness need not be shown by overt physical acts—"'a cutting off of one's normal curiosity by an effort of will' is enough." *United States v. Neville*, 82 F.3d 750, 760 (7th Cir. 1996) (quoting *United States v. Stone*, 987 F.2d 469, 472 (7th Cir. 1993)). Again, evidence demonstrated that during August and September 1998 Fallon signed drafts listing a total of 324 vehicles on behalf of AutoSmart that were payable to Morgan Auto. According to AutoSmart's police book, AutoSmart purchased no vehicles from Morgan Auto during this period. Moreover, when Jerri Anderson pointed out to Fallon that there was a problem with the drafts, he made no effort to investigate the problem. To a normally curious and innocently ignorant person, especially one who co-owns a company, over 300 paid for but unaccounted for vehicles would presumably raise a red flag. However, Fallon did not investigate the problem and told Anderson to record these drafts as loans to Morgan Auto. On these facts, the district court did not abuse its discretion in giving the "ostrich" instruction as a jury could reasonably conclude that Fallon consciously avoided discovering the ongoing fraud.

## C. Motion in Limine

Prior to trial, Fallon filed a motion in limine to preclude impeachment with his two prior state theft convictions, his

federal conviction for conspiracy to alter odometers and mail fraud, and his federal false statement conviction. The court denied the motion with respect to Fallon's 1986 federal conviction to alter odometers and his 1989 federal false statements conviction. Although the two federal convictions were outside the normal ten-year period, the court found that the probative value of the convictions substantially outweighed their prejudicial effect.

The district court's decision to admit these convictions falling outside the ten-year time limitation set forth in Fed. R. Evid. 609(b) causes us concern. As we noted in *United States v. Shapiro*, the legislative history leading to the enactment of Rule 609 indicates that "it is intended that convictions over 10 years old will be admitted very rarely and only in exceptional circumstances." 565 F.2d 479, 481 (7th Cir. 1977) (citing Notes of the Committee on the Judiciary, Senate Report No. 93-1277).

Nevertheless, we are unable to substantively address the appropriateness of the district court's decision that this case falls within the limited "exceptional circumstances" category. Fallon chose not to testify at trial and therefore waived his right to challenge the district court's decision on this issue. Under *Luce v. United States*, "to raise and preserve for review the claim of improper impeachment with a prior conviction, a defendant must testify." 469 U.S. 38, 43, 105 S.Ct. 460, 83 L. Ed. 2d 443 (1984). *See also United States v. Burrell*, 963 F.2d 976, 991-92 (7th Cir. 1992). The *Luce* court noted that when a reviewing court does not "know the precise nature of the defendant's testimony," it is impossible for the court to weigh the probative value of a prior conviction against the prejudicial effect to the defendant. 469 U.S. at 41. Although *Luce* dealt with prior convictions admitted under Rule 609(a)(1), we find that it applies with equal force to convictions admitted under Rule 609(b).

Fallon attempts to distinguish his case by arguing that he explicitly informed the district court that his decision not to testify was based on the denial of the motion in limine, whereas in *Luce* it was unclear to the reviewing court what motivated the defendant's decision not to testify. Neither *Luce* nor its rationale makes exception for a defendant who informs the trial judge that the denial of his motion in limine is the basis for his decision not to take the stand. Accordingly, we find that Fallon waived this argument and the district court's ruling on his motion in limine is unreviewable.

### III. Conclusion

The defendant did not show that the district court abused its discretion by (1) failing to grant a new trial based on the alleged *Brady* violation or (2) giving the "ostrich" instruction to the jury. The defendant waived his right to challenge the district court's ruling on his motion in limine to exclude impeachment with his prior convictions. We therefore AFFIRM his conviction.

A true Copy:

      Teste:

                     _____
                     *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*