In the

 United States Court of Appeals
 For the Seventh Circuit
 ____________________
No. 21-2417
UNITED STATES OF AMERICA,
 Plaintiff-Appellee,
 v.

LONEL L. JOHNSON, JR.,
 Defendant-Appellant.
 ____________________

 Appeal from the United States District Court for the
 Eastern District of Wisconsin.
 No. 1:21-cr-00019-WCG-1 — William C. Griesbach, Judge.
 ____________________

 ARGUED DECEMBER 1, 2022 — DECIDED APRIL 24, 2023
 ____________________

 Before EASTERBROOK, HAMILTON, and KIRSCH, Circuit
Judges.
 HAMILTON, Circuit Judge. A jury convicted appellant Lonel
L. Johnson, Jr. of possessing more than 50 grams of metham-
phetamine with intent to distribute, possessing a ﬁrearm in
furtherance of a drug-traﬃcking crime, and two counts of
possessing a ﬁrearm as a felon. Johnson appeals these convic-
tions on several grounds.
2 No. 21-2417

 Johnson argues ﬁrst that the entire indictment against him
should be dismissed because his Sixth Amendment speedy
trial rights were violated by the delay between his arrest on
state charges and his federal trial. Johnson also challenges the
drug-traﬃcking convictions on several grounds stemming
from the government’s late disclosure of a recording of a prof-
fer statement Johnson had made upon his arrest, on condition
that it not be used against him except for purposes of im-
peachment. We reject these challenges. Finally, Johnson
points out that an oﬃcer testiﬁed improperly to an admission
from the proﬀer during the government’s case in chief and
that the government’s supposed ﬁx of the error only made
matters worse. We agree that the testimony and supposed ﬁx
amounted to an error, but it was harmless in view of the over-
whelming evidence of guilt. We aﬃrm Johnson’s convictions.
I. Factual and Procedural Background
 A. Investigation by State Authorities
 Lonel L. Johnson, Jr. came to the attention of state author-
ities as a suspected drug dealer in February 2020 when an in-
mate called a phone number registered to Johnson. A detec-
tive monitoring the call overheard a voice later recognized as
Johnson’s describing how he identiﬁed conﬁdential inform-
ants among drug buyers. Investigators added Johnson as a
friend through an undercover Facebook account and found a
video showing Johnson holding a handgun.
 Within a few weeks, members of the Brown County Drug
Task Force began working with Johnson’s ex-girlfriend as a
conﬁdential informant. She had a methamphetamine addic-
tion, and she told oﬃcers that she regularly purchased meth
from Johnson. She said that Johnson lived on the upper ﬂoor
No. 21-2417 3

of a two-story apartment that operated as a “ﬂop house”
where drug users and dealers would stay for days or weeks
at a time.
 Working with authorities, the ex-girlfriend exchanged
Facebook messages with Johnson about buying
methamphetamine. The account that she messaged did not
bear Johnson’s name, but on April 2, 2020, the person using it
sent a message saying “Bree, this is El. I got ﬁre.” Johnson
admitted to using this nickname, and both the ex-girlfriend
and an oﬃcer testiﬁed that “ﬁre” referred to
methamphetamine. “El” oﬀered in writing to sell her an
eighth of an ounce of methamphetamine for $100 or half that
amount for $60. The ex-girlfriend testiﬁed that she spoke on
the phone with Johnson the next day and he oﬀered to sell her
methamphetamine, saying he had eight ounces available.
 Oﬃcers executed a search warrant at Johnson’s address on
April 3, 2020. Johnson refused to exit his apartment for 45
minutes. He later admitted that he used the time to ﬂush nee-
dles and drugs down his toilet. Once inside, oﬃcers found a
.22-caliber riﬂe sitting atop a case containing six baggies of
methamphetamine and a glass pipe. Those items were con-
cealed above a ceiling panel in Johnson’s second-ﬂoor living
area. The total weight of the methamphetamine was eight
ounces, matching the quantity Johnson had told the inform-
ant he had available earlier that day. Oﬃcers also found drug
paraphernalia, digital scales, a .22-caliber round, marijuana,
prescription pills, and a debit card bearing Johnson’s name
sitting together in a ﬁrst-ﬂoor vent.
4 No. 21-2417

 B. State Charges and Detention
 State police arrested Johnson during the warrant execu-
tion on April 3, 2020. Shortly after arrest Johnson answered
questions in an interrogation preceded by proper warnings
under Miranda v. Arizona, 384 U.S. 436 (1966). He also spoke
with police in a separate proﬀer session that lasted 90 minutes
and was recorded on video. Johnson agreed to provide his
proﬀer statement on the condition that it be inadmissible
against him except for purposes of impeachment.
 On April 6, 2020, Johnson was charged in state court with
possessing methamphetamine with intent to distribute, main-
taining a drug-traﬃcking place, possessing a ﬁrearm as a
felon, delivering heroin, possessing THC with intent to de-
liver, possessing body armor as a violent felon, obstructing an
oﬃcer, possessing drug paraphernalia, and bail-jumping.
Johnson made his ﬁrst speedy trial request under state law on
May 14, 2020. The Wisconsin Speedy Trial Act presumptively
requires a trial within 90 days of such a demand. Wis. Stat.
§ 971.10(2).
 This timeline was complicated by the COVID-19 pan-
demic. On March 17, 2020, the state courts in Brown County
issued an order adjourning all jury trials through April 15,
2020. The order noted that this period would not count to-
ward the state’s statutory speedy trial requirements. Then, the
Wisconsin Supreme Court issued an order on March 22, 2020
suspending all jury trials through May 22, 2020. The Supreme
Court later extended the suspension of jury trials until each
circuit court received approval of an operational plan ad-
dressing COVID-19 mitigation measures.
No. 21-2417 5

 Johnson made his next speedy trial request in state court
on September 14, 2020. The state court set a trial date of No-
vember 11, 2020 with a backup date of December 9, 2020. On
November 3, the trial was postponed to that backup date and
Johnson was released on reduced bond. On November 25, the
district attorney notiﬁed the state court that he had spoken to
the U.S. Attorney’s Oﬃce in late September and that he ex-
pected Johnson to be charged in federal court. The state court
rescheduled the case for a status conference on January 19,
2021. The state charges were dismissed without prejudice
during that January 19 hearing.
 C. Federal Indictment and Trial
 In the meantime, federal prosecutors had decided on No-
vember 6, 2020 to pursue federal charges against Johnson. He
was indicted in this federal case on January 20, 2021 on four
counts: possessing more than 50 grams of methamphetamine
with intent to distribute, possessing a ﬁrearm in furtherance
of a drug-traﬃcking crime, and two counts of being a felon in
possession of a ﬁrearm or ammunition. Johnson was taken
into federal custody on February 10, 2021. He was arraigned
the next day, and his federal trial was set for April 19, 2021.
 Johnson moved to dismiss the federal indictment on
speedy trial grounds. The district court denied this motion be-
cause time spent in state custody is not considered under the
federal Speedy Trial Act. Johnson’s trial began in the district
court on April 20, 2021. Johnson chose to exercise his right to
represent himself. The court appointed standby counsel for
assistance.
 On the ﬁrst morning of trial, Johnson told the court of a
problem concerning his 90-minute proﬀer session with the
6 No. 21-2417

state and local police on the day of his arrest. Johnson had re-
ceived a detailed written summary of the proﬀer months ear-
lier. But the federal prosecutors had only recently discovered
that a video recording of the proﬀer existed. The prosecution
provided Johnson with a digital copy of the recording just ﬁve
days before trial. But Johnson was unable to play the video
ﬁle on the equipment the jail had available.
 Johnson told the district judge this was a problem because
he could not remember everything that he said during the
proﬀer, and he felt he could not take the stand without know-
ing the proﬀer’s contents. The judge raised the idea of an ad-
journment so Johnson could see the video and prepare his
own testimony. Johnson was not interested in this solution be-
cause he did not want to delay his trial further. The judge in-
structed the prosecution to ensure that Johnson could watch
the proﬀer recording between the ﬁrst and second days of
trial. The judge reserved ruling on the proﬀer statement’s ad-
missibility, noting that it would likely become admissible if
Johnson had a chance to view the video, if he took the stand,
and if he testiﬁed inconsistently. Johnson was able to view the
proﬀer recording before the second day of trial. He ultimately
chose not to testify.
 The government’s trial evidence was strong. On the meth-
amphetamine charges, the jury learned that Johnson admitted
in writing to police that his ﬁngerprints would be on the bags
of methamphetamine because he had handled them the day
before the search. Johnson’s ex-girlfriend testiﬁed to her Face-
book messages and phone call with Johnson in which he of-
fered to sell her methamphetamine and said he had available
the same amount of methamphetamine that was found in his
ceiling later that day. One of the oﬃcers who participated in
No. 21-2417 7

the search testiﬁed that the scales and drug paraphernalia
found in a ﬁrst-ﬂoor vent alongside Johnson’s debit card
looked as if they had fallen from the second ﬂoor where John-
son lived.
 Other admissions by Johnson showed that he had experi-
ence selling drugs. Johnson called himself the biggest middle-
man in town and agreed with an oﬃcer that he was the “meth
king.” Johnson admitted that he would obtain one ounce of
methamphetamine at a time and break it into smaller quanti-
ties that he sold. Further, the jury heard from the oﬃcer who
listened to the jailhouse call that Johnson had developed
methods to avoid selling to conﬁdential informants. In addi-
tion to all of this evidence, the jury heard one oﬃcer improp-
erly testify to Johnson’s admission from his proﬀer statement
that one of the baggies of methamphetamine belonged to him.
 Relevant to the ﬁrearm charges, the jury heard that John-
son admitted during interrogation that the Facebook video
depicted him holding a handgun and that he had sold the gun
for one ounce of methamphetamine. Johnson also stipulated
to the fact that he knew at the relevant time that he had a prior
felony conviction.
II. Analysis
 A. Constitutional Right to a Speedy Trial
 Johnson challenges ﬁrst the district court’s denial of his
motion to dismiss the federal indictment to remedy a viola-
tion of his Sixth Amendment right to a speedy trial. We review
the district court’s legal conclusions de novo and factual ﬁnd-
ings for clear error in this context. United States v. Loera, 565
F.3d 406, 411 (7th Cir. 2009). We ﬁnd no violation here.
8 No. 21-2417

 The Sixth Amendment right to a speedy trial is “one of the
most basic rights preserved by our Constitution.” Klopfer v.
North Carolina, 386 U.S. 213, 226 (1967). The duty is on charg-
ing authorities to “provide a prompt trial.” Dickey v. Florida,
398 U.S. 30, 38 (1970). A violation of this right calls for dismis-
sal of the indictment. Barker v. Wingo, 407 U.S. 514, 522 (1972).
 Johnson’s federal trial occurred with remarkable speed af-
ter his federal indictment and arraignment, within the 70-day
deadline set by the federal Speedy Trial Act, see 18 U.S.C.
§ 3161(c)(1), and without any excluded delays that are so com-
mon under that Act. Johnson contends, however, that his fed-
eral constitutional speedy trial clock began to run back when
the state arrested him, more than a year before his federal trial.
The general rule is that time does not begin to run for a speedy
trial claim “before a defendant is indicted, arrested, or other-
wise oﬃcially accused.” United States v. MacDonald, 456 U.S.
1, 6 (1982). Things may sometimes get a little complicated,
though, when both state and federal prosecutions go forward
against the same defendant for the same conduct. Johnson
contends that the entire time from his arrest by the state
should be applied to his federal prosecution on the theory that
the “federal authorities were merely acting as the state’s alter
ego.”
 When state and federal laws overlap, as in this case, de-
fendants may face prosecution by both state and federal gov-
ernments. Parallel prosecutions are allowed because each
government is a separate sovereign. Each has independent
power to investigate crimes and to make charging decisions
and strategic choices. See Gamble v. United States, 139 S. Ct.
1960, 1966–67 (2019); United States v. Lanza, 260 U.S. 377, 382
(1922). Analysis of speedy trial issues ordinarily applies
No. 21-2417 9

separately to each sovereign’s prosecution: “The decision of
state oﬃcials to arrest someone because he is wanted for con-
duct in violation of state law does not force the federal gov-
ernment to initiate whatever proceedings it might bring for
the same underlying conduct at the same moment.” United
States v. Clark, 754 F.3d 401, 405–06 (7th Cir. 2014).
 Just as neither sovereign can bind the other with its deci-
sion on whether to charge a defendant or how fast to pursue
an investigation, neither sovereign can bind the other to a
speedy trial clock, at least without proof that the two sover-
eigns were not in fact acting separately. We have recognized
(but not found and applied) the possibility that cooperation
between state and federal authorities might result in unfair
and prejudicial delays in a federal prosecution. There might
be a federal speedy trial violation if the state acted as “the
feds’ cat’s paw,” for example, “charging [appellant] … solely
in order to detain him pending an eventual federal indict-
ment.” United States v. Richardson, 780 F.3d 812, 817 (7th Cir.
2015). If that exception exists, the standard of proof would
need to be demanding, though, because state and federal
prosecutors consult and cooperate with one another all the
time. Routine consultations and decisions by one to defer to
the other with a particular defendant or case or categories of
cases fall far short of what might be needed to invoke the pos-
sible exception.
 Johnson claims that “the federal authorities took over the
case at the behest of the state authorities because the state’s
speedy trial clock had expired.” This argument does not ﬁt
neatly into our possible “cat’s paw” exception. Johnson does
not contend that the state was acting as an alter ego for the
federal government when the state charges were ﬁled. Rather,
10 No. 21-2417

Johnson’s theory is that the federal government would not
have prosecuted Johnson at all if the state had not violated his
speedy trial rights under state law. But given the separate-
sovereigns foundation for generally not letting either sover-
eign dictate the timing of the other’s prosecution, a state’s
speedy trial violation would not bar the federal government’s
prosecution unless perhaps the separate sovereigns colluded
in the violation. See, e.g., Richardson, 780 F.3d at 817; Clark, 754
F.3d at 405–06.
 To argue collusion, Johnson notes that the state and fed-
eral charges were similar and based on the same evidence.
That similarity does not show collusion at all. It is only to be
expected in cases where either sovereign would be in a posi-
tion to prosecute. More than parallel charges based on the
same conduct and evidence would be needed to show collu-
sion.
 Johnson also relies on the timing of events in his cases to
show collusion. The federal government indicted Johnson the
day after the state dismissed its charges. But earlier events are
more relevant to and weigh more heavily against collusion
during the state’s charging and detention of Johnson. It was
not until late September 2020 that the U.S. Attorney’s Oﬃce
even became aware of the state case brought against Johnson
back in April 2020. This delay does not support an inference
that the state acted as the alter ego of the federal government
in charging and holding Johnson. See Clark, 754 F.3d at 405
(declining to ﬁnd collusion where “the record is devoid of any
indication that the federal government was involved at all in
his prosecution at the time of the [state] arrest, let alone that
it instructed the state authorities to arrest Clark or that it
wanted him arrested so that it could initiate proceedings
No. 21-2417 11

against him”). Plus, the evidence used against Johnson at his
federal trial consisted entirely of items found in his home dur-
ing the April 2020 search and his own statements given
shortly after arrest. It is not as if state authorities spent the
complained-of time investigating, ﬁnding new witnesses, and
developing a case against Johnson that the federal govern-
ment could not have presented earlier. There is no evidence
that the state and federal government colluded to violate
Johnson’s speedy trial rights through his state detention.
 Absent such evidence of collusion, we consider for consti-
tutional (as opposed to statutory) speedy trial purposes the
three months between Johnson’s federal indictment and his
federal trial. See United States v. Dickerson, 975 F.2d 1245, 1252
(7th Cir. 1992) (“The one-year period between Dickerson’s ar-
rest by state authorities on state charges and the return of the
federal indictment cannot be the basis of a Sixth Amendment
claim.”).
 The Supreme Court identiﬁed four factors to weigh in con-
sidering a Sixth Amendment speedy trial claim in Barker, 407
U.S. at 530. The ﬁrst factor—length of delay—acts as a “trig-
gering mechanism” determining whether we advance to con-
sider the other three factors. Id. If there is no “delay which is
presumptively prejudicial,” then “there is no necessity for in-
quiry into the other factors.” Id.
 A delay approaching one year is considered presump-
tively prejudicial in the Seventh Circuit. E.g., United States v.
Arceo, 535 F.3d 679, 684 (7th Cir. 2008). Here, only three
months elapsed between Johnson’s federal indictment and
trial. This length of time is not presumptively prejudicial and
does not require further speedy trial analysis. The federal
12 No. 21-2417

government did not violate Johnson’s Sixth Amendment right
to a speedy trial.
 B. Constitutional Right to Testify on One’s Own Behalf
 Johnson next claims the district court violated his consti-
tutional right to testify on his own behalf. The accused in a
criminal case has a constitutional right to testify on his or her
own behalf even though (a) the text of the Constitution does
not explicitly include it and (b) at the time of the founding the
opposite rule was ﬁrmly established in the common law: ac-
cused defendants could never testify at their own trials. See
Ferguson v. Georgia, 365 U.S. 570, 573 (1961); see also Akhil
Reed Amar, America’s Unwritten Constitution: The Precedents
and Principles We Live By 105–10 (2012). “Here, as in England,
criminal defendants were deemed incompetent as witnesses.”
Ferguson, 365 U.S. at 574. It was not until 1864 that Maine be-
came the ﬁrst state to enact legislation guaranteeing defend-
ants the right to testify on their own behalf. Id. at 577. And it
was not until 1961 that the Supreme Court recognized this
right under the federal Constitution. Id. at 596.
 The Supreme Court later wrote that this right is rooted in
the Due Process Clauses of the Fifth and Fourteenth Amend-
ments, the Compulsory Process Clause of the Sixth Amend-
ment, and the Fifth Amendment privilege against self-incrim-
ination. Rock v. Arkansas, 483 U.S. 44, 51–53 (1987); see also
Crane v. Kentucky, 476 U.S. 683, 690 (1986) (“Whether rooted
directly in the Due Process Clause of the Fourteenth Amend-
ment … or in the Compulsory Process or Confrontation
clauses of the Sixth Amendment … We break no new ground
in observing that an essential component of procedural fair-
ness is an opportunity to be heard.”). A defendant’s right to
testify on his or her own behalf is “an integral part of the right
No. 21-2417 13

to present a complete defense” and is clearly established by
Supreme Court precedent. Fieldman v. Brannon, 969 F.3d 792,
801 (7th Cir. 2020); see also Rock, 483 U.S. at 49 (“At this point
in the development of our adversary system, it cannot be
doubted that a defendant in a criminal case has the right to
take the witness stand and to testify in his or her own de-
fense.”).
 Johnson had the choice whether to testify at his trial. He
chose not to. He contends, however, that the late disclosure of
his proﬀer recording violated his right. His theory is that the
late disclosure forced him to face “a Hobson’s choice—testify
and risk impeachment with a lengthy recorded proﬀer he had
no reasonable opportunity to review before trial, or not testify
at all.” Johnson argues that the late disclosure caused essen-
tially the same Sixth Amendment deprivation that the Su-
preme Court found in “a rule of evidence that permits a wit-
ness to take the stand, but arbitrarily excludes material por-
tions of his testimony.” Rock, 483 U.S. at 55. Johnson also relies
on Fieldman, in which we followed Rock to hold that barring a
defendant from testifying on a topic material to his guilt or
innocence violated the Sixth Amendment. 969 F.3d at 804–06.
 Rock and Fieldman do not extend to this case. In each of
those cases, the trial court barred the defendant from oﬀering
certain categories of relevant testimony in his defense. John-
son retained the ability to choose whether to testify, making
his situation more like the ones addressed in Luce v. United
States and United States v. Wilson.
 In Luce, the Supreme Court reviewed a defendant’s chal-
lenge to a trial court’s conditional ruling under Federal Rule
of Evidence 609(a) that if Luce testiﬁed and claimed no prior
involvement with drugs, then the government could use a
14 No. 21-2417

prior drug conviction for impeachment. 469 U.S. 38, 39–40
(1984). Luce chose not to testify. As a result, the Supreme
Court said that it could not review the trial court’s conditional
ruling. Luce’s challenge was subject to harmless-error review,
and his choice not to testify left reviewing courts “handi-
capped” in that assessment, which would involve “wholly
speculative” reasoning. Id. at 41–42. The Supreme Court
noted that, without knowing how the testimony would have
unfolded, “the appellate court could not logically term ‘harm-
less’ an error that presumptively kept the defendant from tes-
tifying. Requiring that a defendant testify in order to preserve
Rule 609(a) claims will enable the reviewing court to deter-
mine the impact any erroneous impeachment may have had
in light of the record as a whole.” Id. at 42.
 This court applied Luce to a Fifth Amendment claim also
subject to harmless-error review in United States v. Wilson, 307
F.3d 596, 599–601 (7th Cir. 2002). See also Crane, 476 U.S. at
691 (noting harmless-error analysis applies to improper ex-
clusion of relevant defense testimony). Wilson sought both to
testify about a purported associate and to prevent the govern-
ment from mentioning his selective post-arrest silence in re-
fusing to name the associate. Wilson, 307 F.3d at 598–99. The
trial court conditionally ruled that if the defendant brought
up the associate, then the government could introduce evi-
dence of his post-arrest silence. Id. at 599. Wilson chose not to
introduce any testimony about the associate. After he was
convicted, he argued on appeal that the conditional ruling vi-
olated his Fifth Amendment privilege against self-incrimina-
tion. Relying on Luce and its progeny in other circuits, we
ruled that we could not review Wilson’s Fifth Amendment
challenge. Id. at 601. Wilson chose not to introduce the associ-
ate evidence, so the government did not introduce the
No. 21-2417 15

evidence of his silence. Evaluating the eﬀects of “a potential
introduction of evidence by the government in response to his
potential testimony” would have been an exercise in specula-
tion. Id.
 In both Luce and Wilson, the defendants faced diﬃcult
choices similar to Johnson’s: testify and risk impeachment or
not present desired testimony to the jury. But unlike Johnson,
the defendants in those cases did not face an element of sur-
prise. Both Luce and Wilson knew what impeachment to ex-
pect if they took the stand. Johnson did not know because of
the late disclosure of the proﬀer recording. The district court
here, however, took steps to mitigate that diﬀerence. The
judge ﬁrst asked whether Johnson was requesting a continu-
ance. Johnson said no because he did not want to wait any
longer for trial. Johnson instead wanted the proﬀer to be oﬀ-
limits for impeachment: “If it wasn’t for the proﬀer, then I
would have got on the stand and be able to say certain things
that I want to, but I can’t do that because I can’t even remem-
ber what was put into the proﬀer at all.”
 This was not a good argument for prohibiting possible im-
peachment with the proﬀer. Johnson’s later comments indi-
cate that his ﬁnal decision not to testify was based on learning
the contents of his proﬀer, not on his continuing to feel unpre-
pared to anticipate surprise impeachment. The judge ensured
that Johnson had an opportunity to hear the proﬀer recording
before he had to decide whether to take the stand. After John-
son heard the recording, he chose not to testify, explaining
that “this is a decision to not impeach myself.” By listening to
the recording, Johnson learned that his prior statements
would contradict what he planned to tell the jury. He told the
judge that during his proﬀer, he “just want[ed] to go home so
16 No. 21-2417

I’m saying anything … [the proﬀer] was something I was just
trying to do to go home, like, hey, I just want to go home, I
want to say whatever.” These on-the-record statements make
clear that once Johnson knew the proﬀer’s contents, he chose
not to testify to avoid anticipated impeachment, not because
he did not know his proﬀer’s contents. 1
 Johnson’s challenge based on the late disclosure of the re-
cording, even framed as a violation of his right to testify, is
subject to harmless-error review. E.g., United States v. Books,
914 F.3d 574, 580 (7th Cir. 2019); Ortega v. O’Leary, 843 F.2d
258, 262 (7th Cir. 1988). Johnson chose not to testify, so he left
us without a record of how he would have testiﬁed, of im-
peachment evidence that would have been admitted, and of
how that evidence could have aﬀected the jury’s verdict.
Johnson’s constitutional theory does not warrant reversal.
 C. Rule 16
 Next, Johnson argues that even if the late proﬀer disclo-
sure was not a constitutional violation, it violated Federal
Rule of Criminal Procedure 16 and that the district court
abused its discretion in responding to it. Like the related con-
stitutional claim, this claim is subject to harmless-error review
and is also barred by Johnson’s choice not to testify at trial.
E.g., United States v. Owens, 18 F.4th 928, 940 (7th Cir. 2021).
 Federal Rule of Criminal Procedure 16(a)(1)(B)(i) provides
that upon “a defendant’s request, the government must dis-
close to the defendant … any relevant written or recorded
statement by the defendant if: the statement is within the

 1 The defendant’s dilemma brings to mind the old adage that one

should always tell the truth because it’s the easiest thing to remember.
No. 21-2417 17

government’s possession, custody, or control; and the attor-
ney for the government knows—or through due diligence
could know—that the statement exists.” The rule gives trial
judges discretion in addressing a violation, allowing a judge
to order that the evidence be made available, to grant a con-
tinuance, to bar admission of the evidence, or to issue “any
other order that is just under the circumstances.” Id.
 The district judge’s conditional ruling on using the proﬀer
recording was reasonable and well within his discretion. In
any event, when a district court makes a conditional ruling on
the admissibility of evidence, “the party objecting to it must
satisfy the condition if he wants to preserve the issue for ap-
pellate review.” Aguirre v. Turner Constr. Co., 582 F.3d 808, 814
(7th Cir. 2009); see also Ohler v. United States, 529 U.S. 753,
758–59 (2000); Luce, 469 U.S. at 43. By not testifying, Johnson
failed to satisfy a condition central to the ruling he now tries
to challenge. He left reviewing courts without “a basis for de-
termining whether the judge’s ruling had made a diﬀerence.”
Aguirre, 582 F.3d at 814. Under Aguirre and consistent with the
Supreme Court’s reasoning in Luce discussed above, John-
son’s challenge on appeal is barred by his choice not to testify.
 D. Brady v. Maryland
 Johnson also claims that the late disclosure amounted to a
violation of Brady v. Maryland, 373 U.S. 83 (1963), which re-
quires disclosure, upon request, of exculpatory evidence to an
accused defendant. To show a Brady violation, “a defendant
must establish a reasonable probability that, had the evidence
been disclosed to the defense, the result of the proceeding
would have been diﬀerent.” United States v. Fallon, 348 F.3d
248, 252 (7th Cir. 2003). Such a showing must “focus[ ] not on
18 No. 21-2417

trial preparation, but instead on whether earlier disclosure
would have created a reasonable doubt of guilt.” Id.
 Johnson has not tried to argue that the contents of the rec-
orded proﬀer or his potential testimony would have changed
the outcome of the trial. His counsel acknowledged at oral ar-
gument that there is no material diﬀerence between the con-
tents of the proﬀer recording and the detailed written sum-
mary to which Johnson had access months before his trial. In-
stead, the argument is that, absent the late disclosure, Johnson
would have prepared to testify on his own behalf. We cannot
know what Johnson would have said on the stand, nor could
we do more than guess how the government might have re-
sponded or how any of this might have aﬀected the jury’s ver-
dict. The conclusory statement that “the outcome of the trial
may well have been diﬀerent had he been given the oppor-
tunity to testify on his own behalf” does not establish a Brady
claim. 2
 E. Improper Use of Proﬀer Contents
 Finally, Johnson points out a troubling error from his trial:
a government witness improperly testiﬁed to an admission

 2 In the same paragraph as his Brady argument, Johnson cites an Elev-

enth Circuit case to argue that the late disclosure “render[ed] [the] trial so
fundamentally unfair as to violate due process.” But a key fact in the cited
case was that the prosecutor assured the defendant before trial that the
government had produced all of the defendant’s statements. Lindsey v.
Smith, 820 F.2d 1137, 1150 (11th Cir. 1987). Based on that assurance, the
defendant was unprepared to counter an undisclosed statement upon its
surprise introduction at trial. Id. at 1150–51. Johnson does not claim he was
actively misled as to the existence of the proffer recording. Accordingly,
Lindsey does not help Johnson show that the late disclosure here amounted
to a reversible error.
No. 21-2417 19

Johnson made during his proﬀer interview. The prosecutor
realized this error and claimed that the government would ﬁx
it during redirect. But the government’s “ﬁx” was insuﬃcient
and misleading. Johnson claims that this error requires a new
trial, but he cannot show the prejudice required for that rem-
edy.
 The testimony at issue related to the charge of possessing
methamphetamine with intent to distribute. Recall that when
state police arrested Johnson, he participated in an interroga-
tion that had been preceded by proper warnings under Mi-
randa v. Arizona, 384 U.S. 436 (1966). He also provided a sepa-
rate proﬀer statement. The government was free to use the
contents of the interrogation at trial, but it could not use John-
son’s statements from the proﬀer interview except potentially
for impeachment. At trial, Investigator Brendan Pizzala testi-
ﬁed that, during the interrogation, Johnson had admitted
“that he had touched the bags [of methamphetamine] and
looked at it and only one of the bags was his.” Johnson did
admit to touching the bags during his interrogation, but he
admitted that one bag was his only during his proﬀer.
 The prosecutor noticed the error and pointed it out to the
court during a recess. The government told the court that it
would “quickly correct that statement” on redirect. With Piz-
zala on the stand, the prosecutor said “I just want to clarify
one thing. During cross examination, you were asked by the
defendant about some of the statements he made, and you
testiﬁed that the defendant indicated that one of the bags was
his. Do you remember testifying about that?” Pizzala did re-
member, so the prosecutor continued: “Upon further reﬂec-
tion, did he actually say that during his Mirandized [sic]
20 No. 21-2417

interview?” Pizzala responded, “Not during his Mirandized
[sic] interview.”
 This response from Pizzala implied rather clearly to jurors
that Johnson did admit that one bag of drugs was his, just not
during the interrogation that had been preceded by Miranda
warnings. This “ﬁx” did not ﬁx anything. Instead, it only dou-
bled the jury’s exposure to the improper use of the proﬀer,
contrary to the promise the government had made as a condi-
tion of the proﬀer. The “solution” also doubled the violation
of the district court’s explicit bar on the government’s use of
the proﬀer during its case in chief. This was a troubling error
that should have been further corrected, such as by having the
court make clear to the jury that the government had not pre-
sented any evidence that Johnson admitted one bag of drugs
belonged to him.
 The parties disagree over whether Johnson suﬃciently ob-
jected to the testimony at issue and thus whether we should
review the error under a harmless-error or plain-error stand-
ard. We need not decide whether Johnson properly objected.
Either standard of review requires us to consider whether the
error prejudiced the outcome of trial, and we ﬁnd no preju-
dice here. See United States v. Turner, 651 F.3d 743, 748 (7th Cir.
2011) (“The third prong of the plain error test—whether the
error aﬀected the defendant’s substantial rights—calls for es-
sentially the same inquiry as harmless error analysis.”).
 The harmless-error test looks to “whether it appears ‘be-
yond a reasonable doubt that the error complained of did not
contribute to the verdict obtained.’” Neder v. United States, 527
U.S. 1, 15 (1999), quoting Chapman v. California, 386 U.S. 18, 24
(1967). Under Supreme Court precedent the harmless-error
test can apply to challenges to the “erroneous admission of
No. 21-2417 21

evidence in violation of the Fifth Amendment’s guarantee
against self-incrimination.” Neder, 527 U.S. at 18. In such
cases, the Supreme Court has rephrased the harmless-error
standard of review as whether it is “clear beyond a reasonable
doubt that a rational jury would have found the defendant
guilty absent the error.” Id.
 Similarly, the third prong of the plain-error standard re-
quires that the complained-of error “aﬀect substantial rights”
(or in other words “have been prejudicial”) for reversal.
United States v. Olano, 507 U.S. 725, 734 (1993); see also Fed. R.
Crim. P. 52(b). The Supreme Court says that this prong’s anal-
ysis “normally requires the same kind of inquiry” as the
harmless-error test with “one important diﬀerence: It is the
defendant rather than the Government who bears the burden
of persuasion with respect to prejudice.” Olano, 507 U.S. at
734. This burden-shifting makes no diﬀerence in Johnson’s
case. Even assuming that the government had this burden, it
was met by the quantity and quality of incriminating evi-
dence, aside from the one point of improper testimony.
 Reviewing the other evidence presented at trial, it is clear
beyond reasonable doubt that a rational jury would have
found Johnson guilty of possessing methamphetamine with
intent to distribute. Properly admitted and uncontested evi-
dence showed that Johnson told oﬃcers his ﬁngerprints
would be found on the six bags of methamphetamine hidden
in his ceiling because he had handled the bags the day before
the home search. Johnson also admitted that he dealt up to an
ounce at a time and was the biggest middleman in town for
methamphetamine. A detective had listened to Johnson de-
scribe to an inmate the methods he used while selling drugs
from his home to screen out undercover oﬃcers. Oﬃcers
22 No. 21-2417

found scales, drug paraphernalia, and a .22-caliber bullet with
Johnson’s own debit card in a downstairs vent and a .22-cali-
ber gun sitting on top of the drugs in Johnson’s ceiling. John-
son’s ex-girlfriend testiﬁed that Johnson oﬀered to sell her
methamphetamine the day before and the day of the search.
Speciﬁcally, Johnson said he had eight ounces of metham-
phetamine available, which matched the quantity found in
the six bags of drugs.
 Johnson argued to the jury that he did not know the meth-
amphetamine was in his ceiling and that someone else must
have put it there. Given the admission that his ﬁngerprints
would appear on the bags of drugs because he had handled
them the day before and his telling his ex-girlfriend that he
had the quantity of methamphetamine found available for
sale, Johnson’s argument was unpersuasive and countered by
a large amount of trial evidence. Setting aside Pizzala’s im-
proper remarks and considering only the properly admitted
evidence, it is clear beyond a reasonable doubt that a rational
jury would ﬁnd Johnson guilty of possessing the six bags of
methamphetamine with intent to distribute.
 The judgment of the district court is AFFIRMED.